IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| JASON JOHNSON and AUBRI JOHNSON, individually and for and on behalf of their minor son, T.J.,<br><br>        Plaintiffs,<br><br><br>vs.<br><br><br>UINTAH SCHOOL DISTRICT; UTAH STATE BOARD OF EDUCATION; SYDNEE DICKSON, Utah Superintendent of Public Instruction; RICK WOODFORD, Uintah School District Superintendent; TAMMY CHRISTENSEN; MARY JANE HUBER; MEGAN SMITH; SARAH FLUCKIGER; SHELBY BROWN; HEATHER HEATH; BELEN CABALLERO; LYNN BIGELOW; DONNY LAWS; KEN GIROT; JAMES MADSEN; LAURA HADDEN; JANE and JOHN DOES 1–10; and ENTITIES 1–10,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' PARTIAL MOTION TO DISMISS**<br><br>Case No. 2:24-cv-00238<br><br>Judge Tena Campbell |

---

Plaintiffs Jason Johnson and Aubrey Johnson, individually and on behalf of their minor son, T.J. (collectively, Plaintiffs), bring this lawsuit against Defendants the Uintah School District (USD), the Uintah State Board of Education (USBE), Entities 1–10, as well as fourteen individuals (the individual Defendants), including Sydnee Dickson, Rick Woodford, Tammy Christensen, Mary Jane Huber, Megan Smith, Sarah Fluckiger, Shelby Brown, Heather Heath,

1

Belen Caballero, Lynn Bigelow, Donny Laws, Ken Girot, James Madsen, Laura Hadden, and John and Jane Does 1–10, to recover the costs, among other damages, associated with caring for T.J., who now suffers permanent brain injuries from a school playground accident. For the reasons set forth below, the court grants in part and denies in part the Defendants' motion to dismiss. (ECF No. 7.)

**FACTUAL ALLEGATIONS**[1]

This case asks the court to identify the parties responsible for a young boy's tragic playground accident and determine whether the events giving rise to and exacerbating his injuries were accidental, negligent, or the result of an institutional custom of treating injured male students with less care than female students.

On January 4, 2022, Discovery Elementary, a school within the Uintah School District, was scheduled to conduct but ultimately deferred its regularly scheduled "ground-covering review" of the woodchip-coated playground because the ground was too frozen, making it difficult for the maintenance team to determine whether there was sufficient cushioning for children to play safely. (Compl., ECF No. 1 at ¶¶ 30–31, 34, 36.) On March 22, 2022, Discovery Elementary once again deferred its playground safety assessment because the ground was too frozen. (Id. ¶ 35.) Despite having deferred two consecutive safety assessments, Discovery Elementary permitted its students to continue to play on the playground equipment.

On April 7, 2022, T.J., an eight-year-old second-grader at Discovery Elementary, fell off the monkey bars during recess, landing on his head on the frozen woodchips. (Id. ¶¶ 29–32.) Afterwards, T.J. was "dazed and debilitated," losing some motor functions and the ability to

---

[1] The court accepts the Complaint's well-pled allegations as true for the purposes of this order. See Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., 771 F.3d 697, 700 (10th Cir. 2014).

"stand or walk without help." (Id. ¶ 40.) Ms. Huber, a playground supervisor, student aide, and building-use supervisor, was on duty and witnessed the accident, as well as T.J.'s resulting dizziness and loss of function. (Id. ¶ 41.)

Immediately following the accident, Ms. Huber brought T.J. to Principal Christensen's office, where T.J. met with and described his own symptoms to Ms. Brown and Ms. Fluckiger, Principal Christensen's secretaries, and Ms. Smith, the school nurse. Ms. Brown, Ms. Fluckiger, and Ms. Smith then jointly completed a "Concussion: Signs and Symptoms Checklist" (Concussion Checklist) for T.J., a USBE-required administrative procedure for dealing with students with head injuries. (Concussion Checklist, ECF No. 1-3.)

The Concussion Checklist administered to T.J. was prepared by the USBE and Utah Department of Health in conjunction with guidance from the Centers for Disease Control and Prevention (CDC). It was provided to all the schools in the USD, including T.J.'s, and states:

> Students who experience one or more of the signs or symptoms of concussion after a bump, blow, or jolt to the head should be referred to a healthcare professional with experience in evaluating for concussion. For those instances when a parent is coming to take the student to a healthcare professional, observe the student for any new or worsening symptoms right before the student leaves.

(Compl. ¶ 44 (citing ECF No. 1-3).) The Concussion Checklist also states that school administrators must: "SEND A COPY OF THIS CHECKLIST WITH THE STUDENT FOR THE HEALTHCARE PROFESSIONAL TO REVIEW." (Id.)

After T.J. relayed his symptoms to Ms. Brown, Ms. Fluckiger, and Ms. Smith, Ms. Brown transcribed the key points on the Concussion Checklist. (See Compl. ¶ 43; ECF No. 1-3.) Specifically, Ms. Brown noted that T.J. "appears dazed, stunned, or confused about events; shows behavior or personality changes; headache or 'pressure' in head; balance problems or dizziness; doesn't 'feel right'; feels sluggish, hazy, foggy, or groggy." (Compl. ¶ 43 (citing ECF No. 1-3).) Fifteen minutes after he was brought to Principal Christensen's office, T.J.'s

headache reportedly subsided. (ECF No. 1-3.) After 30 minutes, Ms. Brown noted on the Concussion Checklist that T.J. was no longer displaying any of the listed signs or symptoms of a concussion. (Id.) Despite the Concussion Checklist requirement that administrators escalate student care in the event that a student displays any symptoms associated with a concussion, none of the school personnel involved referred T.J. to a healthcare professional or informed T.J.'s parents. (Compl. ¶ 45.)

After T.J.'s symptoms had reportedly subsided, Ms. Smith, Ms. Brown, and Ms. Fluckiger sent T.J. back to class with his two teachers, Ms. Heath and Ms. Caballero, a decision that the Plaintiffs allege was premised on the administrators' reliance on gender stereotypes that "boys will be boys" engaging in "rough and tumble" play and can simply "shake it off even after suffering and reporting injury." (Id. ¶ 147.) Once T.J. returned to the classroom, Ms. Heath and Ms. Caballero allegedly observed T.J. showing worsening symptoms throughout the afternoon, but they took no action to send him back to the nurse's office or elsewhere for additional medical care. (Id. ¶ 52.) There is no indication that either Ms. Heath or Ms. Caballero were aware that Ms. Brown, Ms. Fluckiger, and Ms. Smith had filled out a Concussion Checklist for T.J. or that T.J. had earlier exhibited concussion-like symptoms.

When T.J. was sent home at the end of the school day, no one from his school provided his parents with a copy of the Concussion Checklist, nor, apparently, did any school administrator inform T.J.'s parents about the extent of his symptoms. Eventually, the Johnsons, noticing something was wrong, brought their son to a nearby hospital in Vernal, Utah. He was immediately life-flighted to Primary Children's Hospital in Salt Lake City, where he spent months recovering from a serious brain injury. (Id. ¶ 73.) As a result of that head injury, T.J. is now partially paralyzed, disfigured, and will have permanent loss of motor function. He will

require ongoing, costly care and therapy from his parents and healthcare professionals to help him move, speak, and function. (Id. ¶ 83.)  His parents now expend significant time working with T.J. through his physical, occupational, and speech therapy, which has interfered with their ability to focus on, care for, and spend time with their other three children.

The Plaintiffs identify a number of issues with the USD and USBE policies and practices, as well as with several of the individual Defendants' decision-making processes, all of which they allege contributed to or exacerbated T.J.'s accident and injuries.  Critical to this motion to dismiss, the Plaintiffs allege that, on information and belief, a review of school incident log statistics, which the USD and USBE both maintain and were aware of, will demonstrate that USD has a pattern of treating male student injuries less seriously than it treats female student injuries, with female students receiving greater attention, care, and concern.  (Id. ¶¶ 53, 177–80.)[2]  The Plaintiffs also allege that the Defendants had a policy or custom of not taking reasonable action to promote student safety on playgrounds, particularly regarding ground coverings, student accidents, head injuries, and emergency response.  (Id. ¶¶ 57, 59.)   In support, the Plaintiffs cite to the school's deferrals of two consecutive playground safety assessments, and to work order notes from the weeks after T.J.'s accident, in which Discovery Elementary maintenance team administrators indicated that the school had "recognized the need to 'redistribute or add woodchips to all of our playgrounds.'"  (Id. ¶ 36.)

The Plaintiffs bring twelve causes of action against two municipal entities (the USD and USBE), and against a variety of school, USD, and USBE administrators, maintenance staff, and teachers (the individual Defendants), all of which relate to T.J.'s fall and resulting injuries.  The

---

[2] The Complaint does not specify how much, if any, of this statistical information about gender disparities in medical attention in the USD is publicly available.

Plaintiffs' federal law claims allege that certain Defendants violated Title IX and deprived T.J. of constitutional rights under the Equal Protection and Substantive Due Process Clauses of the Fourteenth Amendment to the United States Constitution. (Id.) The Plaintiffs' claims arising under state law allege negligence, vicarious liability, premises liability, negligent infliction of emotional distress, and loss of filial consortium, as well as gender discrimination in violation of the Utah Constitution. In total, the Plaintiffs seek $10 million in economic damages and $50 million in non-economic damages, plus statutory interest, expenses, and attorney fees. (Id. at 34.) Citing to the relevant pleading standards and qualified immunity, the Defendants move to dismiss all claims against the individual Defendants. They also move to dismiss all claims against the USD and the USBE except the following: claim one (negligence); claim two (vicarious liability); claim three (premises liability), which is only asserted against the USD; and claim five (loss of filial consortium). (ECF No. 7 at 1.)

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff's complaint "must plead facts sufficient to state a claim to relief that is plausible on its face." Slater v. A.G. Edwards & Sons, Inc., 719 F.3d 1190, 1196 (10th Cir. 2013) (internal punctuation omitted) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). A claim is facially plausible when the allegations in support contain factual content that allows the court to draw a reasonable inference that the defendants are liable for the misconduct alleged. See Burnett v. Mortg. Elec. Registration Sys., Inc., 706 F.3d 1231, 1235 (10th Cir. 2013). The court must accept all well-pled allegations in the complaint as true and construe them in the light most favorable to the plaintiff. See Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., 771 F.3d 697, 700 (10th Cir. 2014). The court's function is "not to weigh potential evidence that the parties might present at trial, but to assess

whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." Sutton v. Utah Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir. 1991)).

## ANALYSIS

### I.    Title IX

Title IX of the Education Amendments Act of 1972 protects students from discrimination on the basis of sex in any educational program or activity receiving federal funds. 20 U.S.C. § 1681(a).[3] To state a claim under Title IX, the Plaintiffs must plausibly allege that: 1) an appropriate person with the authority to take corrective notice; 2) had actual knowledge of, and 3) was deliberately indifferent to and failed to adequately respond to; 4) discrimination on the basis of sex in the school's program. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998). The Plaintiffs assert that the USD and USBE violated Title IX through their deliberate indifference to the disadvantaged health and well-being of their male students, including T.J. (Compl. ¶¶ 174–84.) Specifically, the Plaintiffs rely on allegations that the USD and USBE maintained but ignored statistics showing that, at T.J.'s school, among others in the USD, "male students who are injured do not receive the same level of care, concern, or attention as female students"—meaning that the USD and USBE's joint failure to take corrective action deprived male students of equal access to an education. (Id. ¶¶ 177–83.) For the reasons discussed below, the court finds that the Plaintiffs' allegations meet all four elements for pleading a Title IX claim.

---

[3] There is no dispute that the USD and USBE are governed by Title IX.

### A.  Appropriate Person

To demonstrate that an "appropriate person" was on notice of gender-based disparities in student care, the first element the Plaintiffs must satisfy to adequately state their Title IX claim, the Plaintiffs must identify "at a minimum, an official of [either entity] with authority to take corrective action [on behalf of the school or school district] to end the discrimination." Gebser, 524 U.S. at 290 (citing 20 U.S.C. § 1682); see also Ross v. Univ. of Tulsa, 859 F.3d 1280, 1288–89 (10th Cir. 2017) (citing Escue v. N. Okla. Coll., 450 F.3d 1146, 1152 (10th Cir. 2006)).  The Plaintiffs allege that Ms. Dickson, the USBE Superintendent of Public Instruction, and Mr. Woodford, the USD Superintendent, both had the authority—and, upon notice, an obligation—to improve the treatment of or issue consequences for those withholding necessary care from students.  (Compl. ¶¶ 56–58.)  The Plaintiffs allege that these individuals were on notice by virtue of their positions at the USD and USBE, which both maintained similar statistics and incident logs regarding student injuries and school-provided care.  (Compl. ¶¶ 177-81.)

At this stage, the court cannot determine as a matter of law whether these individuals were aware of the alleged statistical disparities in student care, or responsible for correcting such disparities or disciplining the employees who contributed to the disparities.  Discovery is needed about the individual Defendants' roles within their respective organizations, which is why the Tenth Circuit generally instructs courts to reserve the "appropriate person" question for summary judgment or trial, once the parties have had the opportunity to exchange discovery.  See Murrell v. Sch. Dist. No. 1, Denver, 186 F.3d 1238, 1247 (10th Cir. 1999) (recognizing that school superintendents may have the power to intervene in Title IX violations, but declining to list the job titles of those officials who do or do not possess such control "[b]ecause officials' roles vary

8

among school districts" and it is "necessarily [a] fact-based inquiry … [to] decid[e] who exercises substantial control for the purposes of Title IX liability").

In any event, the court notes that the contents of the Concussion Checklist confirm that student healthcare is governed by the USBE, meaning that top-level officials at the USBE, like Ms. Dickson, can presumably correct any failure to abide by the rules.  (See ECF No. 1-3.)  And the Plaintiffs allege that the USD and USBE, led by Mr. Woodford and Ms. Dickson, were responsible for and "control[led] all policies, practices, rules, guidelines, customs, and regulations relative to school playgrounds, ground coverings, student accidents, head injuries, staffing schools with medical providers, and emergency response."  (Compl. ¶¶ 56–58.)  Accordingly, the court can reasonably infer at this preliminary stage of the case that officials at the USD and USBE, including but not limited to Ms. Dickson and Mr. Woodford, had the ability to halt any mistreatment, neglect, or abuse of students seeking care at T.J.'s school.

### B.  Actual Notice

The court next examines the second element of a Title IX claim: whether the Plaintiffs have adequately pled that the USD and USBE had "actual notice" of the school's alleged gender discrimination.  The Plaintiffs allege that the USD and USBE knew about a "substantial risk" of gender discrimination or gender stereotyping because both entities possessed similar information about gender-based statistical disparities in student care in the USD and in T.J.'s school. (Compl. ¶ 177–81.)  Generally, federal courts recognize that "Title IX, like other anti-discrimination schemes, permits an inference that a significant gender-based statistical disparity may indicate the existence of discrimination," meaning a school has "actual notice" under Title IX.  Cohen v. Brown Univ., 101 F.3d 155, 170–71 (1st Cir. 1996).  But "[t]he more a risk [of discrimination] becomes generalized, the more that risk is likely to fall outside of the narrowly

9

circumscribed scope of Title IX liability." Escue, 450 F.3d at 1154 (citing Simpson v. Univ. of Colo., 372 F. Supp. 2d 1229, 1235–36 (D. Colo. 2005)).  Accordingly, to plead that the USD and USBE had "actual notice" of gender discrimination, the Plaintiffs must allege that the gender disparities evidenced in the USD and USBE student injury logs relate to the circumstances giving rise to T.J.'s injury.  This can be a largely factual inquiry, which is therefore more appropriately (and more often) examined on summary judgment.  For example, in Simpson, the Tenth Circuit reversed summary judgment, reinstating a plaintiff's Title IX claim, because discovery supported a finding that the University of Colorado had "actual knowledge" of the risk of its athletes committing sexual assault during recruiting season through its possession of 1) statistics reporting a high "risk of sexual misconduct in connection with [the college athlete] recruiting [process]" and 2) news articles showing high numbers of sexual assault by football players at the plaintiff's school.  372 F. Supp. 2d at 1235–36.

The Defendants seek dismissal on the basis that this case is analogous to M.S. v. Galena Unified School District No. 499, in which the United States District Court for the District of Kansas dismissed a plaintiff's Title IX claim on summary judgment for failure to raise a genuine factual dispute about actual notice of gender disparities in student treatment.  (ECF No. 7 at 24 (citing 446 F. Supp. 3d 743, 799 n.47 (D. Kan. 2020)).)  In that case, discovery revealed that the school district possessed but failed to act on data that showed a high prevalence of school bullying against all students across the state of Kansas.  But the court determined that the statewide bullying statistics did not show the gender makeup of the bullied victims— accordingly, the statistics could not provide the school district with actual notice of gender discrimination.  Here, by contrast, the Plaintiffs allege that the USD and USBE maintained statistics that specifically examined gender-based disparities in student care in T.J.'s school

district.  (See Compl. ¶¶ 177–81.)  Further, here, unlike in M.S. v. Galena Unified School
District No. 499, the Plaintiffs have not yet been provided the opportunity to conduct discovery
into the alleged statistical discrimination.

The court finds that the Plaintiffs have adequately pled "actual notice," similarly to the
plaintiffs in Simpson, because they have plausibly alleged that the USD and USBE possessed
statistics specific to T.J.'s school showing a gender disparity in student care.  The USD and
USBE's discrimination was purportedly caused by USD and USBE employees engaging in a
pattern of failing to adhere to the USD and USBE safety guidelines and regulations.  These are
credible allegations which the court can reasonably expect will be bolstered (or discredited) by
discovery.  And because the Plaintiffs do not yet have access to the contents of the USD and
USBE student injury statistics, the Plaintiffs cannot be reasonably expected to plead additional
details tying this statistical discrimination to the circumstances of T.J.'s accident.  Accordingly,
the Plaintiffs cannot yet "define[] 'care, concern, or attention,' how it is measured, how data is
collected [by the USD or USBE], or how many data points it consists of" (ECF No. 7 at 24)
when this information is solely in the Defendants' possession.  The Plaintiffs have adequately
pled the "actual notice" element to the best of their ability with the information they currently
have access to.

### C.  Discrimination on the Basis of Gender

The court next examines whether the Plaintiffs have, in describing the statistics
maintained by the USD and USBE, pled facts sufficient to show that the school discriminated
against T.J. and other similarly situated injured male students.  As a preliminary matter, the court
notes that physical abuse on the basis of sex as well as gender stereotyping are forms of sex
discrimination under Title IX.  See Sh.A. ex rel. J.A. v. Tucumcari Mun. Schs., 321 F.3d 1285,

1289 (10th Cir. 2003) (finding that educational institutions discriminate where students suffer physical harm on the basis of their gender); Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (finding employers cannot treat men and women differently on the "assum[ption] or insist[ence] that they match[] the stereotype associated with their group") (quoting Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 707 n.13 (1978)); see also Simonton v. Runyon, 232 F.3d 33, 38 (2d Cir. 2000) (recognizing that "a suit [by a man] alleging harassment or disparate treatment based upon nonconformity with sexual stereotypes is cognizable under Title VII as discrimination because of sex").[4]

The Defendants contend that the statistics alleged are insufficient to plead gender discrimination in violation of Title IX because the Plaintiffs have not explained how they have ruled out nondiscriminatory explanations for the disparities in care. (See ECF No. 16 at 10–11 (citing Doe v. Univ. of Denver, 952 F.3d 1182, 1194 (10th Cir. 2020)).) The court rejects this argument for two reasons. First, as the Defendants concede, the Tenth Circuit requires that Title IX plaintiffs account for "alternative explanations" only if a non-discriminatory reason is "obvious" to the court. Doe v. Univ. Denver, 852 F.3d at 1194. For example, in Doe v. University of Denver, the plaintiff alleged that males accused of campus assault at the University of Denver were assumed guilty of committing assault—and therefore faced discrimination in the Title IX process—because the campus statistics showed that most campus sexual assaults involve female complainants and male perpetrators. Id. The Tenth Circuit held that it could not reasonably conclude from these statistics alone that the school had discriminated against males

---

[4] The Tenth Circuit "assess[es] Title IX discrimination claims under the same legal analysis [framework] as Title VII claims." Throupe v. Univ. of Denver, 988 F.3d 1243, 1251 (10th Cir. 2021) (citing Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172 (10th Cir. 2001)).

accused of assault without considering obvious, non-discriminatory reasons for those disparities: namely, that male students on average might commit more serious assaults and/or that women are more commonly targets of sexual assault. Id.  To pose another example, the court can imagine obvious, non-discriminatory reasons for gender disparities in the school application context.  For instance, while statistics might show that a school had admitted more women than men, this disparate outcome could be gender-neutral if women make up the greater share of applicants.  Accordingly, male applicants denied admission under those circumstances could not proceed on a Title IX violation without ruling out this possible explanation.  See, e.g., Tabor v. Hilti, Inc., 703 F.3d 1206, 1223–24 (10th Cir. 2013) (finding in a Title VII case that "an employer will not, for example, be liable for a gender imbalance in its work force that is due to a dearth of qualified female applicants (for reasons that are not the employer's fault)") (cleaned up).  Here, by contrast, the court finds no obvious or even plausible non-discriminatory explanation for why male students with the same injuries as female students would receive less medical attention at school.  The Defendants' motion provides an explanation for why all young students face health risks at school, but notably fails to account for gender-based differences in the resulting injuries or care.  (See ECF No. 16 at 11 (citing factors identified by the Utah Department of Health for why young students of both genders face health risks at school).)

Second, the court notes that the Tenth Circuit's holding in Doe v. University of Denver—requiring that a Title IX plaintiff account for alternative explanations for school gender disparities—is, as a policy matter, less relevant to the circumstances surrounding the alleged discrimination in the present case.  In Doe v. University of Denver, the Tenth Circuit noted that it was requiring the plaintiff to account for alternative explanations for gender disparities in part because the facts underlying the alleged discrimination, "the gender makeup of sexual-assault

perpetrators, victims, and reporters," were almost entirely outside of the University of Denver's control.  See id. at 1194–95.  Similarly, in the school application example referred to above, the gender makeup of applicants—as opposed to admitted students—is a factor largely outside of a university's control.  In either of these circumstances, Title IX plaintiffs are equally situated with their schools to parse the data, using experts to rule out obvious alternative explanations for the resulting gender disparities.  In the campus sexual assault context, a plaintiff might discredit non-discriminatory explanations for why most perpetrators of campus assault were men by relying on experts and statistical studies showing that men and women perpetrate campus assaults at equal rates.  And in the school application example, the plaintiff might rule out alternative explanations for gender disparities in admitted students by examining publicly available data on the gender makeup of the school's applicant pool.  Here, by contrast, there is no question that the Defendants have direct and total control over the level of care they can offer or provide to injured students, like T.J.  Accordingly, it is the Defendants who, after discovery, more appropriately bear the burden of ruling out alternative explanations for any resulting gender disparities.   In any event, the court finds that this question regarding "alternative explanations" for statistical disparities is more appropriately answered on summary judgment or trial, at which point the parties will have had the opportunity to have their respective experts examine the USD and USBE incident logs, as well as potential alternative explanations for the disparities.

In sum, the court recognizes that the Defendants are skeptical that the statistics will reflect that the school discriminated against T.J. and other injured male students on the basis of gender.  To be sure, the Plaintiffs may face problems of proof later in these proceedings depending on what the USD and USBE accident log statistics show—in other words, a jury might, after reviewing the statistics and incident logs, reject the inference that the USD and

USBE were deliberately indifferent to gender disparities in student care.  <u>See, e.g.</u>, <u>Cannon v.</u> <u>Univ. of Chicago</u>, 441 U.S. 677, 680 at n.2 (1979) (reversing grant of motion to dismiss Title IX claim despite recognizing that evidence uncovered through discovery might prove that the percentage of admitted women mirrored the percentage of applicants who were women).  Or the jury could conclude that the difference in care that the school provided to male versus female students is not statistically significant—alternatively, the court could make this determination on summary judgment if it finds that no reasonable juror could make a finding of statistical significance.  But the strength of the Plaintiffs' evidence of discrimination will be tested at the close of discovery, meaning that these questions are more appropriately addressed by a factfinder than as a matter of law.

### D.  Deliberate or Intentional Indifference

The Defendants argue that because the USD and USBE lacked actual knowledge of gender discrimination, the entities could not have been "deliberately indifferent" to the mistreatment of male students.  (<u>See</u> ECF No. 7 at 24; ECF No. 16 at 9–10.)  But because the court finds the pleadings sufficient to demonstrate that the USD and USBE had actual notice of gender discrimination and yet failed to intervene, the court cannot dismiss the Title IX claim for failure to adequately plead deliberate—or "intentional"—indifference.  (<u>Cf.</u> ECF No. 16 at 9–10.)  Accordingly, the court finds that the Plaintiffs' claims are analogous to a non-binding Title IX case which was mistakenly or inappositely relied upon by the Defendants (ECF No. 16 at 9–10), <u>Pederson v. Louisiana State University</u>, in which the Fifth Circuit recognized that failing to provide equal opportunities for students because of "stereotypical assumptions about their interests and abilities" meant "that [the] institution intended to treat women differently because of their sex."  213 F.3d 858, 880 (5th Cir. 2000).  Accordingly, the Fifth Circuit held that actual

notice of gender stereotyping followed by institutional inaction constitutes "intentional discrimination."  Id.  So too here, the Plaintiffs, by adequately pleading notice and inaction, have met the Title IX pleading standards for deliberate indifference.

In sum, the Court declines to find as a matter of law that the Plaintiffs' Title IX claim is so implausible as to warrant dismissal.  The Plaintiffs adequately allege that the USD and USBE knew or should have known that male students similarly situated to T.J. were being denied an educational benefit, the appropriate level of school-provided care, and yet failed to prevent further discrimination.

## II.    Equal Protection

The Plaintiffs' tenth cause of action alleges that individual Defendants Principal Christensen, Ms. Smith, Ms. Fluckiger, Ms. Brown, Ms. Heath, Ms. Caballero, and Ms. Huber violated T.J.'s constitutional rights by discriminating against him on the basis of his gender. (See Compl. ¶¶ 185–96.)  The Equal Protection Clause of the Fourteenth Amendment requires that the government treat similarly situated persons alike.  See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985) (citing U.S. Const. amend. XIV, § 1).

Acknowledging that gender is a protected class under the Fourteenth Amendment,[5] the individual Defendants argue that the Plaintiffs' equal protection claim must be dismissed because they have qualified immunity from suit and because the Plaintiffs have failed to plausibly allege gender discrimination.  For the reasons stated below, the court agrees with these arguments in part and dismisses the Plaintiffs' equal protection claims against Principal Christensen, Ms. Heath, Ms. Caballero, and Ms. Huber because the Plaintiffs have failed to allege plausible facts

---

[5] See Miss. Univ. for Women v. Hogan, 458 U.S. 718 (1982) (recognizing that gender is a protected class under the Fourteenth Amendment and applying intermediate scrutiny to claims of gender discrimination).

sufficient to show that these individuals were involved in any discriminatory decision-making. However, the court denies dismissal of the Plaintiffs' Fourteenth Amendment claim against Ms. Smith, Ms. Fluckiger, and Ms. Brown, the individuals who were plausibly involved in discriminatory decision-making about T.J.'s care.

### A. Gender Discrimination

To prevail on an equal protection claim, the Complaint must contain well-pled allegations that each of the individual Defendants named was engaged in gender discrimination—namely, by treating T.J. differently than they would have treated a similarly situated female student seeking medical care and attention. See Davis v. Utah, No. 2:18-cv-926 TS-PMW, 2019 WL 2929770, at *6 (D. Utah July 8, 2019) (dismissing constitutional claim against several of the named defendants for failure to allege "an affirmative link between the defendant and the challenged conduct" because "a complaint must 'make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state'") (citing Bennett v. Passic, 545 F.2d 1260, 1262–63 (10th Cir. 1976); Rizzo v. Goode, 423 U.S. 362, 375 (1976); Kite v. Kelley, 546 F.2d 334, 337 (10th Cir. 1976); Robbins v. Oklahoma, 519 F.3d 1242, 1250 (10th Cir. 2008), aff'd, 2021 WL 3930277 (10th Cir. Sept. 2, 2021).

For the same reasons detailed in the court's analysis of the Plaintiffs' Title IX claim, the court finds that the statistical evidence alleged supports a reasonable inference that female students receive better, more appropriate medical care in the USD and, more specifically, at Discovery Elementary. Accordingly, it is plausible that, had T.J. been a girl, the individual Defendants personally involved in the critical decision-making about the appropriate level of care—Ms. Smith, Ms. Fluckiger, and Ms. Brown—would have referred T.J.'s care to medical

professionals in adherence to the School's Concussion Checklist.  The Plaintiffs have adequately

alleged constitutional violations—through actual conduct or inaction—by the individual

Defendants responsible for the school's decision not to call a doctor, bring T.J. to the hospital, or

send the Concussion Checklist home to T.J.'s parents.

By contrast, the court finds that the Plaintiffs' allegations fail to tie Principal Christensen,

Ms. Huber, Ms. Heath, and Ms. Caballero to any specific unconstitutional, discriminatory

conduct, therefore warranting partial dismissal of the equal protection claim regarding these four

individual Defendants.  First, the court rejects the Plaintiffs' argument that Principal Christensen

was responsible for discriminatory treatment simply because her office was the site of T.J.'s

concussion evaluation.  (E.g., Compl. ¶¶ 11, 205.)  There are no allegations demonstrating that

Principal Christensen was involved in any decision-making, let alone discriminatory decision-

making, surrounding T.J.'s evaluation and care—or lack thereof.  The court's decision to dismiss

claims against Principal Christensen is consistent with common sense, which dictates that the

school nurse, not the school principal, would bear the primary responsibility for determining the

appropriate level of student medical care.

Second, the court cannot discern Ms. Huber's individual involvement in any allegedly

unconstitutional decision-making or how Ms. Huber's involvement would have exacerbated

T.J.'s injuries.  The Plaintiffs allege that administrators give less care and attention to injured

male students.  But those statistics on their own do not provide a factual basis from which the

court can reasonably infer that Ms. Huber would have personally attested to T.J.'s symptoms—

rather than let him speak for himself—were he a girl.  Rather, from the face of the Complaint,

the court finds that Ms. Huber appears to have appropriately escalated T.J.'s care, in accordance

with her role as a playground supervisor, by bringing T.J. to the nurse after his fall.  See Davis,

2019 WL 2929770, at *7 (dismissing claims against "several individual Defendants [who were] not affirmatively linked to an alleged constitutional violation").  Nor can the court reasonably infer that Ms. Huber's failure to describe T.J.'s symptoms contributed to or exacerbated T.J.'s injury.  Indeed, the Plaintiffs allege that Ms. Smith, Ms. Fluckiger, and Ms. Brown, based on T.J.'s descriptions of his symptoms and their own personal observations, possessed enough information to determine that T.J. was at serious risk of a concussion and in need of professional medical care.

Finally, the court finds that the Plaintiffs have not pled facts sufficient to show that Ms. Heath and Ms. Caballero's decision not to return T.J to the nurse after he was sent back to class was premised on unconstitutional gender stereotypes.  The complaint contains no specific facts regarding what trauma symptoms or health issues these teachers witnessed or were aware of, and what decisions each of them made about T.J.'s care.  Indeed, it is unclear whether T.J.'s teachers knew about his fall, that he had hit his head, that a Concussion Checklist was administered, or that T.J. had exhibited symptoms listed on the Concussion Checklist.  And the court cannot reasonably expect, without more factual support, that T.J.'s teachers, who presumably have little to no medical training, would have second-guessed the school nurse's decision had T.J. been a female student.  And while the USD and USBE incident logs may demonstrate that "female students receiv[e] greater attention, care, and caution than those involving males" (Compl. ¶ 53), the court cannot reasonably infer, based solely on these incident logs, that these two teachers made any discriminatory decisions about T.J.'s care.  This conclusion is bolstered by the court's reasonable expectation that the USD and USBE statistics about the level of care and attention allocated to injured students refer to the care provided by school medical professionals, like the school nurse.

In sum, the court denies the Defendants' motion to dismiss the Plaintiffs' equal protection claim against Ms. Smith, Ms. Fluckiger, and Ms. Brown, but dismisses the claim against individual Defendants Principal Christensen, Ms. Huber, Ms. Heath, and Ms. Caballero.

### B. Qualified Immunity

Qualified immunity provides government actors a basis to dismiss constitutional equal protection claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. See Robbins, 519 F.3d at 1249 (holding that there is a "special interest in resolving the affirmative defense of qualified immunity at the earliest possible stage of a litigation"). Accordingly, once a government official raises a qualified immunity defense, as the Defendants have here, the burden shifts to the plaintiff to establish two elements. See Hollingsworth v. Hill, 110 F.3d 733, 737–38 (10th Cir. 1997).

First, the pleadings must make a threshold showing that the state actor violated a constitutional right by discriminating between "similarly situated" groups, here male and female students. SECSYS, LLC v. Vigil, 666 F.3d 678, 685–86 (10th Cir. 2012); Brown v. Montoya, 662 F.3d 1152, 1172–73 (10th Cir. 2011) (citing Barney v. Pulsipher, 143 F.3d 1299, 1312 (10th Cir. 1998)). Overcoming the qualified immunity defense means that the Plaintiffs must plausibly allege that Ms. Smith, Ms. Brown, and Ms. Fluckiger purposefully treated T.J. differently because he is a boy—meaning that they acted "'because of,' not merely 'in spite of,' the action's adverse effects upon an identifiable group." Ashcroft, 556 U.S. at 676–77 (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979)); see also Fowler v. Stitt, 104 F.4th 770, 784–86 (10th Cir. 2024) (finding that an equal protection claim must allege state actors' purposeful discrimination, which can be inferred "from the totality of the relevant facts … [including] disparate impact, the historical background of the challenged action, the sequence of events

20

leading up to the challenged action, and departures from the normal procedural sequence"). Based on the totality of the relevant facts—including the Complaint's well-pled allegations about the USD's and USBE's historical discrimination towards male students and because these administrators inexplicably departed from the USBE's standard concussion protocol when treating T.J—the court finds that the Plaintiffs have adequately pled that Ms. Smith, Ms. Fluckiger, and Ms. Brown purposefully discriminated on the basis of gender.

Turning to the second prong for overcoming qualified immunity, the Plaintiffs must also adequately plead that "the unlawfulness of [the government officials'] conduct was 'clearly established at the time.'" District of Columbia v. Wesby, 583 U.S. 48, 62–63 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). For a constitutional right to be clearly established,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. Plaintiff is not required to show that the very conduct in question has previously been held unlawful. She is, however, required to demonstrate the unlawfulness was "apparent" in light of established law. Generally, this requires that the plaintiff demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited.

Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1255–56 (10th Cir. 1998) (quotations omitted). A plaintiff satisfies the "clearly established" prong when he "(1) identif[ies] an on-point Supreme Court or published Tenth Circuit decision, or (2) shows the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains." Cox v. Glanz, 800 F.3d 1231, 1247 (10th Cir. 2015).

The parties disagree about the required level of factual similarity between the present circumstances and the precedent that demonstrates the "clearly established" constitutional right. The Plaintiffs contend that they are required only to show, more generally, that it is "clearly

established" under Tenth Circuit or Supreme Court precedent that sex discrimination is

unconstitutional.  (ECF No. 13 at 29.)[6]  The Defendants counter that they are entitled to qualified

immunity because the Plaintiffs failed to present—nor has the court identified in its exercise of

diligence—an authoritative holding specifying that reasonable school nurses and/or secretaries

treating student injuries must provide students with equal medical care regardless of the students'

gender.  (See ECF No. 7 at 34.)  The correct pleading standard to overcome qualified immunity

lies somewhere in the middle, and the court rejects Defendants' request for qualified immunity

because the Plaintiffs' equal protection claim arises under a "clearly established" theory of

unconstitutional gender discrimination.

      Supporting the court's denial of qualified immunity here, the Supreme Court has already

determined that state educational institutions may not discriminate against men based on

stereotypes about feminine weakness or inferiority.  See Miss. Univ. for Women v. Hogan, 458

U.S. 718, 727 (1982) (finding that the plaintiff's gender-based classification unconstitutionally

discriminated based on the "roles and abilities of males and females").  Accepting as true the

statistics and historical background alleged, the school administrators responsible for T.J.'s care

decisions discriminated by treating male students as physically superior or stronger than female

students, and therefore more likely to recover without additional medical care and attention.

Under Hogan, the court concludes that a reasonable person standing in the individual

Defendants' shoes at the time should or would have known that providing subpar care to male

students based on such stereotypes about male students' relative "abilities" was unconstitutional.

Id.  Because, under this clearly established law, the court finds that it is "beyond debate" that the

---

[6] The court agrees that the right to be free from gender discrimination is clearly established by
the Supreme Court and Tenth Circuit, and therefore beyond debate here.  See, e.g., Davis v.
Passman, 442 U.S. 228, 234–35 (1979); Starett v. Wadley, 876 F.2d 808, 814 (10th Cir. 1989).

misconduct alleged—differential care on the basis of gender—is unconstitutional, the remaining individual Defendants—Ms. Smith, Fluckiger, and Ms. Brown—are not entitled to qualified immunity on the Plaintiffs' equal protection claim. The court therefore turns to whether the Plaintiffs have adequately stated a claim for municipal liability against the USD under 42 U.S.C. § 1983.

### III.    Municipal Liability

The Plaintiffs' eleventh claim separately ascribes municipal liability to the USD under 42 U.S.C. § 1983 based on the individual Defendants' decisions—outlined above in the court's discussion of the Plaintiffs' equal protection claim—to deny T.J. appropriate care in violation of the Equal Protection Clause. A municipal entity, like the USD, is not automatically liable for the unconstitutional, discriminatory actions of its employees. See Seamons v. Snow, 206 F.3d 1021, 1029 (10th Cir. 2000). But courts can impose § 1983 liability against a school district when its employees' "enforcement of the [school district's] policies or customs . . . causes a deprivation of a person's federally protected [constitutional] rights." Dodds v. Richardson, 614 F.3d 1185, 1202 (10th Cir. 2010); see also Olsen v. Layton Hills Mall, 312 F.3d 1304, 1317–18 (10th Cir. 2002) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)).

Under Monell v. New York City Department of Social Services, 436 U.S. 658, 690–95 (2018), to state a claim for municipal liability, a complaint must allege facts satisfying the three elements of a § 1983 claim: First, a plaintiff must show the existence of "a municipal policy or custom—either an official rule or one so entrenched in practice as to constitute an official policy." Finch v. Rapp, 38 F.4th 1234, 1244 (10th Cir. 2022). "Next, a plaintiff must show that the municipality was deliberately indifferent to constitutional violations that were the obvious consequence of its policy." Id. Similarly to a Title IX claim, "when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a

constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm," it is liable.  <u>Barney</u>, 143 F.3d at 1307.  Third and "[f]inally, a plaintiff must show that the policy directly caused his constitutional injury."  <u>Id.</u>; <u>see also</u> <u>Graves v. Thomas</u>, 450 F.3d 1215, 1218 (10th Cir. 2006).

The USD argues principally that the Plaintiffs have not, by citing statistical disparities, adequately pled the existence of a USD policy or custom of mistreating or stereotyping male students.  (ECF No. 7 at 25–29.)  Whether a municipality has an unconstitutional discriminatory custom or policy—here, one of differential treatment on the basis of gender—is usually a question of fact for a jury to decide.  But courts in the Tenth Circuit recognize that the existence of a discriminatory custom or policy "is not a fact that can be baldly asserted at the pleading stage."  <u>Griego v. City of Albuquerque</u>, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015); <u>see also</u> <u>Young v. City of Albuquerque</u>, 77 F. Supp. 3d 1154, 1187–88 (D.N.M. 2014); <u>Atwell v. Gabow</u>, 2008 WL 906105, at *6 (D. Colo. Mar. 31, 2008).  And as this court has explained:

> [w]here a policy or custom is formal or written, a plaintiff may state the policy and where it is codified to sufficiently plead its existence.  However, in the case of an informal and unwritten policy, a plaintiff must 'either [plead] a pattern of multiple similar instances of misconduct … or use other evidence, such as [an employee's] statements attesting to the policy's existence.'

<u>Mercado v. Ogden City</u>, No. 120-cv-90-RJS-DAO, 2024 WL 757265, at *26 (D. Utah Feb. 23, 2024) (citing <u>Griego</u>, 100 F. Supp. 3d at 1213)); <u>see also</u> <u>Martinez v. Winner</u>, 771 F.2d 424, 443–44 (10th Cir. 1985) (setting forth the level of detail sufficient to show an unconstitutional policy).

The court finds that, for the same reason the Plaintiffs have adequately alleged Title IX and Equal Protection Clause violations, they have, by alleging facts about the USD incident log statistics, adequately pled that USD employees followed a widespread pattern or custom of

discriminating against similarly situated, injured male students, including T.J.—meaning the court can reasonably expect discovery to show that there have been "multiple similar instances of misconduct" violating male students' right to equal treatment. Mercado, 2024 WL 757265, at *26; see, e.g., Hunt v. Cent. Consol. Sch. Dist., 951 F. Supp. 2d 1136, 1220 (D.N.M. 2013) ("The Court concludes that, in relation to the [discriminatory policy or custom element], because the Plaintiffs' § 1983 equal-protection claim is based on the same alleged factual circumstances as their Title VII claims, the analyses are parallel, and the Complaint adequately alleges that they were subjected to disparate-treatment discrimination based on their [religion].").

The court recognizes that the Plaintiffs may ultimately face problems of proof regarding the existence of an unwritten custom of discrimination at the root of certain employees' decisions to withhold health services for male students, including T.J. See, e.g., Giraldo v. City of Hollywood, 142 F. Supp. 3d 1292, 1306 (S.D. Fla. 2015) (granting summary judgment on municipal liability § 1983 claim because "the bare statistics are not sufficient to support a jury finding that there is an official policy, or an unofficial policy or custom, of gender discrimination"); cf. Ingram v. Madison Square Garden Ctr., Inc., 709 F.2d 807, 810–11 (2d Cir. 1983) (finding that a small statistical sample, taken in conjunction with other evidence indicative of bias, was sufficient to support an inference of discriminatory practice); Watson v. City of Kansas City, 857 F.2d 690, 696 (10th Cir. 1988) (finding that evidence of police misconduct over a period of time supported the existence of a discriminatory practice). The court recognizes from experience that it is the extremely rare municipal liability, Title IX, or Equal Protection Clause case where a municipal employee will expressly acknowledge their discriminatory bias. But given that the USBE and USD allegedly maintain statistics showing gender differences in the level of student injury treatment (ECF No. 7 at 5 (citing Compl. ¶¶ 177–80)), the court can

reasonably expect that the Plaintiffs will uncover other instances of injured male students in the USD being similarly mistreated.  And, as discussed above in the court's Title IX analysis, there is no obvious non-discriminatory explanation for differences in the level of care provided to male and female students.

The Defendants also seek dismissal of the Plaintiffs' municipal liability claim for failure to adequately plead causation, arguing that the Plaintiffs make no allegations from "which one can infer that these individuals knew their discretion was highly likely to inflict harm on T.J." (ECF No. 7 at 28.)  But this argument contradicts common sense.  It does not take a doctor to deduce that the failure to treat head trauma could exacerbate a child's brain injury.  (See ECF No. 7 at 28–29.)  This, of course, is why school administrators in the USD are required to complete a formal Concussion Checklist—a level of care that is seemingly unique to dealing with head trauma, as opposed to other types of injuries.  (See ECF No. 1-3.)  And surely it is reasonable to infer that Ms. Smith, in her capacity as the school nurse, would be aware of the consequences of withholding necessary care to an injured student.

In sum, the court finds that the Plaintiffs have adequately stated their § 1983 municipal liability claim.

## IV.    Substantive Due Process

The Plaintiffs' twelfth cause of action asserts that the individual Defendants' decisions to permit students to use the uninspected playground and deny T.J. appropriate medical treatment by sending him back to class violated T.J.'s substantive due process rights under the Fourteenth Amendment.  (See Compl. ¶¶ 207–09.)  The Substantive Due Process Clause prohibits state actors from "depriv[ing] any person of life, liberty, or property," including their right to bodily integrity, "without due process of law."  U.S. Const., amend. 14, § 1; Williams v. Barney, 519 F.3d 1216, 1220 (10th Cir. 2008); Albright v. Oliver, 510 U.S. 266, 272 (1994).

26

To overcome dismissal of a substantive due process claim, the Tenth Circuit requires well-pled allegations demonstrating that state actors have engaged in an abuse of state power that "shocks the conscience." Muskrat v. Deer Creek Pub. Sch., 715 F.3d 775, 786 (10th Cir. 2013). This pleading standard is heavier than the standard applied to claims alleging negligence or even willful misconduct—as the court discusses below in evaluating the applicability of the Utah Governmental Immunity Act (UGIA). "To satisfy the 'shocks the conscience' standard, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Livsey v. Salt Lake Cnty., 275 F.3d 952, 957–58 (10th Cir. 2001); see also Seegmiller v. LaVerkin City, 528 F.3d 762, 767 (10th Cir. 2008) (applying the "shocks the conscious" test to tortious conduct). "Conduct that shocks the judicial conscience ... is deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice." Seegmiller, 528 F.3d at 767 (quotations omitted). "[A] plaintiff must demonstrate [an outsized] degree of outrageousness and a magnitude of potential or actual harm." Id.; see also Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist., No. 19, 77 F.3d 1253, 1257 (10th Cir. 1996) (substantive due process violations must be pled as something more serious "than an ordinary tort" to be actionable under § 1983). Evaluating the Plaintiffs' allegations about the school administrators' misconduct, the court finds that the Plaintiffs fail to state a substantive due process violation.

Most critically, the Complaint lacks allegations demonstrating how any of the individual Defendants arbitrarily abused their authority, employed their authority as an instrument of oppression against students, or indicated their intent to harm T.J. Instead, the facts alleged show that the school officials in charge of T.J.'s care on the day of his injury took some—albeit

potentially misguided—steps to provide T.J. care in line with aspects of the concussion protocol, by taking T.J. to a nurse after his fall and monitoring his symptoms over a period of at least 30 minutes.  Similarly, there are no allegations sufficient to show that the school administrators' decision to permit students to play on the frozen playground was motivated by malice or an abuse of power.  A jury might conclude that T.J.'s injuries could have been mitigated had these officials made different decisions—for example, if they had not ignored the risks when they sent T.J. back to class or had not let the schoolchildren play on the frozen ground until it could be inspected.  But the Tenth Circuit makes clear that "merely allowing unreasonable risks to persist" is not conscience-shocking.  Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995).  The court finds that the Plaintiffs' allegations are far more "analogous to a fairly typical state-law tort claim," circumstances which, though undeniably tragic, are not sufficient to show a violation of T.J.'s substantive due process rights.  Collins v. City of Harker Heights, 503 U.S. 115, 128 (1992).

The Plaintiffs argue that they should be exempted from the substantive due process provision's "shock the judicial conscience" pleading standards because T.J. was "particularly vulnerable" or "defenseless" as a minor student in Discovery Elementary's care—contending, in other words, that school officials should be held to a higher standard of care and that the court's conscience should be "more easily shocked" by injuries experienced by underage students.  (See ECF No. 13 at 30–32.)  But the Tenth Circuit has not announced a lower "shocks the conscience" pleading standard for the school setting.  Instead, the Tenth Circuit maintains that even student injuries at the hands of school officials must qualify as "brutal and inhumane abuse," as opposed to "careless[ness]," to shock the conscience.  Muskrat, 715 F.3d at 787 (finding that a teacher slapping a student in the face or restraining a student at his desk for a few

minutes did not shock the conscience"); see also Abeyta, 77 F.3d at 1257 (requiring that school officials act with "malice and sadism" for their conduct to qualify as shocking the conscience). For this reason, the Tenth Circuit recognized a substantive due process violation in a case where a teacher inflicted "excessive corporal punishment" by beating a student so severely that the teacher was reported for child abuse. Garcia, 817 F.2d at 650.[7] While the court condemns corporal discipline as well as negligent or reckless mistreatment of minor students, the abuse outlined in Garcia is far afield from a playground accident, like T.J.'s. On the facts alleged, the court cannot reasonably infer that T.J.'s injuries resulted from purposefully abusive conduct motivated by "malice or sadism." Garcia, 817 F.3d at 655. And an "underlying negligent act" alone does not rise to the level of a substantive due process violation. Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d 909, 930 (10th Cir. 2012).

The Plaintiffs also rely on non-binding precedent from other circuits to support their argument that the court should apply a lower "shocks the conscience" standard because T.J. was "particularly vulnerable" as a minor student. (See ECF No. 13 at 31 (citing G.C. ex rel. Cosco v. Sch. Bd. of Seminole Cnty., 639 F. Supp. 2d 1295, 1304 (M.D. Fla. 2009); A.M. ex rel. Youngers v. N.M. Dep't of Health, 65 F. Supp. 3d 1206, 1213 (D.N.M. 2014)).) But this precedent is easily distinguished from the present facts and is therefore unpersuasive. In G.C. ex rel. Cosco, the United States District Court for the Middle District of Florida discussed applying a lower "conscience-shocking threshold" for neurodivergent students who suffered from severe developmental disabilities, like non-verbal autistic children. The decision did not extend extra

---

[7] Other circuits similarly recognize that school officials' actions "shock the conscience" if the allegations detail excessive corporal punishment in the imposition of school discipline. See, e.g., Neal v. Fulton Cnty. Bd. of Educ., 229 F.3d 1069, 1075 (11th Cir. 2000) (finding allegations of excessive, "brutal" corporal punishment in school disciplinary setting are sufficient to shock the conscience); Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980) (similar).

protections for neurotypical children, like T.J. prior to his injury.  See id.  In any event, even the direct physical abuse inflicted by the neurodivergent student's teachers in G.C. ex rel. Cosco was deemed "not shocking," leading the court to dismiss the plaintiff's substantive due process claim. Id.  The Plaintiffs' reliance on A.M. ex rel. Youngers v. New Mexico Department of Health, is similarly misplaced.  (See ECF No. 13 at 31 (citing 65 F. Supp. 3d at 1213).)   In that case, the United States District Court for the District of New Mexico established lower substantive due process pleading standards for claims involving the abuse and neglect of adults who, prior to being neglected, suffered from severe developmental disabilities.  The Plaintiffs' allegations make clear that T.J., prior to his accident, did not fall into this category of particularly vulnerable or defenseless plaintiffs.

In sum, even though, as the Defendants do not dispute, the Plaintiffs have sufficiently alleged negligence, loss of filial consortium, and premises liability on the basis that some of the individual Defendants breached concussion protocol and ignored playground surface assessment safety guidelines, the Plaintiffs have not pled facts sufficient to demonstrate that any of the administrators' actions were "egregious" enough to shock the judicial conscience.  The court therefore dismisses the Plaintiffs' substantive due process claim.

### V.    Utah Tort Claims

The Defendants next argue that many of the Plaintiffs' state law tort claims must be dismissed because they are barred by the UGIA.  (See ECF No. 7 at 6–10 (citing Utah Code Ann. § 63G-7-101(3)).)  The UGIA applies if defendants are governmental entities, employees, or agents, and the alleged tort "aris[es] out of the performance of the employee's duties, within the scope of employment."  Id.  But this immunity to tort actions is limited in certain circumstances.  Relevant here, the UGIA limits a plaintiff's ability to sue government employees in their personal capacity unless "the employee acted or failed to act through fraud or willful

misconduct[.]"  Utah Code Ann. § 63G-7-202(3)(i).  Pleading "[w]illfulness requires alleging

facts sufficient to show (1) that the government actor intentionally performed a wrongful act

(2) with an awareness that injury will likely result."  <u>Salo v. Tyler</u>, 417 P.3d 581, 590 (citing

Utah Code Ann. § 63G-7-202(3)(c)(i)); <u>see also</u> <u>Golding v. Ashley Cent. Irrigation Co.</u>, 793 P.2d

897, 901 (Utah 1990) (finding willful misconduct where an actor knew about a dangerous

condition from which serious injury was a probable result but failed to act); <u>Milligan v. Harward</u>,

355 P.2d 62, 63 (Utah 1960) (explaining that conduct that is merely inadvertent or grossly

negligent is insufficient to overcome immunity, but conduct that is wanton, reckless, or manifests

a knowing and deliberate indifference to the risk of injury is considered "willful").

    Accordingly, to survive dismissal of the Plaintiffs' state law tort claims against the

individual Defendants, the Plaintiffs must allege facts sufficient to show that these Defendants

acted willfully or recklessly, with an awareness that an injury would likely result.

## A.  Negligence and Loss of Filial Consortium

    The Defendants move to dismiss on UGIA immunity grounds the Plaintiffs' first claim

for negligence and fifth claim for loss of filial consortium to the extent these claims name the

USD and USBE employees in their personal capacity.  (<u>See</u> ECF No. 7 at 6–8 (citing Compl.

¶¶ 86–105).)  Specifically, the Defendants claim that the Plaintiffs' first and fifth claims are

barred by the UGIA because the Plaintiffs have not pled that each of the named employees was

"grossly negligent, willful, reckless and/or manifested a knowing and deliberate indifference" in

either their actions or inaction regarding T.J.'s care.[8]  (<u>Id.</u> at 7.)  The Plaintiffs counter that

evaluating the individual Defendants' willfulness requires a factual, not legal, inquiry about the

---

[8] The individual Defendant employees concede that they were performing government functions
and acting within the scope of their employment in furtherance of their employer's interests
during T.J.'s accident.  <u>See</u> Utah Code Ann. § 63G-7-101(2)(b).

Defendants' knowledge and intent, and that the Complaint alleges facts sufficient to overcome the individual Defendants' UGIA defense.[9] (See ECF No. 13 at 8–9.)

The court finds that the Plaintiffs have adequately pled that some of the individual Defendants—specifically, Ms. Brown, Ms. Fluckiger, and Ms. Smith, who completed the concussion protocol form but disregarded its instruction to escalate medical care—acted recklessly or with knowing and deliberate indifference to T.J.'s injuries when they sent T.J. back to class without additional care. Ms. Brown, Ms. Smith, and Ms. Fluckiger evidently understood that T.J. was displaying multiple indicators of a serious concussion, given that they jointly noted these symptoms, flagged by the USBE and CDC as indicators of a concussion, on T.J.'s Concussion Checklist. (Id. ¶ 43.) The court can reasonably infer that any school administrator working with children, but especially Ms. Smith, the school nurse, would be familiar with the serious health risks associated with head injuries and concussions. And yet each of these three individuals was involved in the decision to send T.J. back to class, rather than escalating his care to a doctor or healthcare professional in accordance with the Concussion Checklist. (Id. ¶ 45.) Further, the school's Concussion Checklist also states clearly that its administrators—here, Ms. Brown, Ms. Smith, and Ms. Fluckiger—must provide a copy of the document to healthcare professionals and the student's parents upon a student's release from the school's care. (Id. ¶ 46.) The only logical conclusion to be drawn from this requirement is that it is important for healthcare providers to track the progression of a head injury. However, these three individual Defendants inexplicably failed to comply, leaving T.J.'s parents and medical providers in the dark about his need for immediate medical attention. (Id. ¶ 47.) Put simply, these three

---

[9] The Plaintiffs do not dispute that operating a school is a well-settled "governmental function" that can be granted immunity under the statute. See Ledfors v. Emery Cnty. Sch. Dist., 849 P.2d 1162, 1164 (Utah 1993).

individual Defendants are not immune to the Plaintiffs' state law tort claims because the facts

alleged support a reasonable inference that they willfully or recklessly disregarded the USBE

concussion protocol despite an awareness of the risks of T.J.'s head trauma.  See Helf v. Chevron

U.S.A. Inc., 361 P.3d 63, 74 (Utah 2015) (denying summary judgment for worker's

compensation claim because reasonable inferences supported a conclusion that an employee's

actions would risk a dangerous event).

     By contrast, the Plaintiffs have not pled facts sufficient for the court to infer that the other

individual Defendants acted "willfully," as opposed to negligently.  Specifically, the court cannot

reasonably infer that Ms. Huber acted "willfully" to deprive T.J. of proper medical attention by

leaving him to explain his symptoms to Ms. Smith, Ms. Brown, and Ms. Fluckiger as they filled

out the Concussion Checklist.  As an initial matter, there is no support for the Plaintiffs'

allegation that Ms. Huber should have known T.J. was at a greater significant risk of serious

brain injury if he described his own symptoms.  (See Compl. ¶¶ 43, 206.)  Indeed, as discussed

above, the Plaintiffs undermine their own argument by simultaneously asserting that T.J.'s

relaying of his own symptoms, as transcribed in the Concussion Checklist, was sufficient to put

the nurse and secretaries on notice that he was displaying the signs of a concussion and therefore

needed escalated medical care.  (See ECF No. 13 at 9.)  Nor have the Plaintiffs alleged that Ms.

Huber's actions violated any school policy or mandate about who should relay symptoms or how

a playground supervisor should act upon bringing a student to the school nurse.

     Similarly, T.J.'s teachers, Ms. Caballero and Ms. Heath, were not involved in filling out

the Concussion Checklist, and therefore are not responsible for the decision to send T.J. back to

class, rather than to a doctor.  There are no allegations that Ms. Caballero or Ms. Heath even had

a copy of the Concussion Checklist to give to T.J.'s parents, or that these teachers knew T.J. had

shown signs of a concussion in the immediate aftermath of his fall.  While T.J.'s teachers could have sent T.J. back to the school nurse if his symptoms persisted or worsened, there are no facts pled suggesting that their failure to do so amounts to willful disregard of a known risk.  Without more specific allegations about what the teachers knew or saw, the court cannot reasonably expect schoolteachers to second-guess a school nurse's care decisions.

Nor can the court reasonably infer that Principal Christensen acted willfully with a knowledge or understanding of the risks to T.J.'s health solely because T.J. was evaluated in her office.  The Complaint contains no allegations demonstrating that Principal Christensen was involved in T.J.'s evaluation or care decisions.  (Id. ¶ 205.)

Finally, the court finds that the Plaintiffs have not set forth facts sufficient to show that the individual Defendants who let students continue to play on the frozen and uninspected playground were involved in any misconduct more serious than ordinary negligence.  The Complaint contains no allegations suggesting that any of the individual Defendants involved in playground safety were substantially certain of a high risk of serious playground injury—like, for example, if there were previous instances of serious student injuries.  Indeed, elementary school-aged children are regularly permitted to play on woodchip-covered playgrounds in all seasons, both in and out of school, leading the court to conclude that the maintenance team's decision not to close the playground—absent additional facts demonstrating ill-will or recklessness—is one a reasonable person would make.  Moreover, the Plaintiffs' claims against these individual defendants similarly fail because they do not identify which of the individual Defendants named were involved in the decision to let students continue to play on the frozen playground despite the deferred safety assessment.

In sum, the court finds that, with the exception of Ms. Brown, Ms. Smith, and Ms. Fluckiger, the remainder of the individual Defendants (Ms. Dickson, Mr. Woodford, Principal Christensen, Ms. Huber, Ms. Heath, Ms. Caballero, Ms. Bigelow, Mr. Laws, Mr. Girot, Mr. Madsen, and Ms. Hadden) have immunity from the Plaintiffs' state law negligence claims.  See Benda v. Roman Catholic Bishop of Salt Lake City, 384 P.3d 207, 210 (Utah 2016) (holding that the claim for loss of consortium is "derivative from the [negligence] cause of action existing [on] behalf of the injured person").  Accordingly, the Plaintiffs' state law tort claims for negligence and loss of filial consortium (the Plaintiffs' first and fifth claims) are dismissed against these individual Defendants.

### B.  Respondeat Superior and Vicarious Liability

With the Plaintiffs' consent, the court dismisses the Plaintiffs' second cause of action against the individual Defendants.

### C.  Negligent Infliction of Emotional Distress

Because the Plaintiffs concede that all the Defendants are immune to claims for negligent infliction of emotional distress, the court dismisses the Plaintiffs' fourth cause of action.  See Utah Code Ann. § 63G-7-201(4)(b).

### VI.    Utah Constitutional Claims

Finally, the Plaintiffs' sixth, seventh, and eighth causes of action allege that the USD and USBE violated the Utah Constitution's Equal Rights Provision based on the same conduct underlying their Fourteenth Amendment equal protection claim: the Defendants' deliberate indifference to gender bias towards elementary-aged, male students,[10] like T.J.  (Compl. ¶ 142.)

---

[10] The Plaintiffs alleged deliberate indifference under the Utah Constitution based on Defendants' "age-based biases" towards elementary school students (Compl. ¶¶ 148–49, 155–59, 165, 167–68, 170–71), but their Opposition briefing clarifies that their state constitutional claims

Damages are recoverable only if the constitutional provision violated is self-executing, Cavanaugh v. Woods Cross City, No. 1:08-CV-32-TC-BCW, 2009 WL 4981591, at *6 (D. Utah Dec. 14, 2009), and the Complaint "establish[es] three elements: (1) the plaintiff suffered a flagrant violation of his or her constitutional rights; (2) existing remedies do not redress his or her injuries; and (3) equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries." Spackman ex rel. Spackman v. Bd. of Educ., 16 P.3d 533, 537–39 (Utah 2000), aff'd, 625 F.3d 661 (10th Cir. 2010). Regarding the second Spackman factor, the Plaintiffs bear the burden to make a "showing that the[ir] § 1983 claim cannot provide recovery for all alleged injuries." Blackmore v. Carlson, No. 4:21-CV-00026-DN-PK, 2024 WL 2883010, at *24 (D. Utah June 7, 2024). Under these standards and after careful consideration of the Plaintiffs' Complaint, the court finds that the Plaintiffs have not and cannot state a damages claim under the Utah Constitution because any injury resulting from the Defendants' alleged violations of the Utah constitution would be redressed by § 1983's existing remedies.

Most notably, the Plaintiffs have not carried their burden to show that § 1983 damages are inadequate to address their damages because they do not dispute that succeeding on their state constitutional claims for gender discrimination would provide the same relief—economic damages, non-economic damages, and legal expenses—as succeeding on their federal constitutional claim. Nor do the Plaintiffs explain why the Utah Constitution creates stronger or different protections than the Fourteenth Amendment. And this redressability conclusion is bolstered by the parallels between the Plaintiffs' federal and state constitutional causes of action.

---

are premised on gender discrimination. (ECF No. 13 at 16–17.) Accordingly, the court does not address a separate cause of action relating to age discrimination.

(Compare Compl. ¶¶ 195–96, 200–01 ("[T]he deprivation of equal protection under the law exposed T.J. to and proximately caused further injury and resulted in a permanent deprivation of his access to equal education . . . Plaintiffs otherwise suffered additional harm and incurred damages as a result of the deprivation of equal protection."), with id. ¶¶ 150–51 ("The discrimination caused harm and related damages to T.J., depriving him of his physical and mental health and well-being …. The discrimination violated the Utah Constitution and interfered with T.J.'s ability to enjoy equally his civil rights and privileges, including but not limited to: the civil right to be free from discrimination on the basis of gender.")).

The Plaintiffs contend that it is premature for the court to dismiss their state constitutional claims because it is not yet certain whether a federal remedy can redress the harm alleged—arguing, in other words, that they may uncover some unidentified remedy to mitigate losses under their state constitutional claim that is unavailable under the Fourteenth Amendment's Equal Protection Clause.  (See ECF No. 13 at 5 (citing McCubbin v. Weber Cnty., No. 1:15-cv-132, 2017 WL 3394593, at *23 (D. Utah Aug. 7, 2017); P.J. ex rel. Jensen v. Utah, No. 2:05-cv-739-PGC, 2006 WL 1702585, at *15 (D. Utah June 16, 2006).)  But the Plaintiffs' Complaint provides a precise understanding of the nature of the Plaintiffs' injuries and the available remedies under both the state and federal constitutions—which mirror one another.  And the Plaintiffs have undermined their argument that the federal and state constitutions could provide different relief for gender discrimination by simultaneously contending that Article IV of the Utah Constitution was based on the Fourteenth Amendment and passed for the purpose of creating a self-executing version of the Fourteenth Amendment.  (See ECF No. 13 at 13 (noting that the Utah Constitution's equal rights "clause is quite similar to the Equal Protection Clause of

the U.S. Constitution … follow[s] the form of the Equal Protection Clause … [and was] intended [to be] self-executing to ensure maximum protection for sex-related rights").)

Given the overlap in the damages sought, proceeding with both state and federal equal protection claims would amount to an impermissible attempt at a double recovery.  E.g., Campbell v. Whitear, No. 2:21-cv-421-JNP-CMR, 2023 WL 6283370, at *7 (D. Utah July 21, 2023) (recommending dismissal because state constitutional claims are fully encompassed and redressed by § 1983 claims), adopted by, 2023 WL 6276596 (D. Utah Sept. 29, 2023); Hoggan v. Wasatch Cnty., No. 2:10-cv-1204-DS, 2011 WL 3240510, at *2 (D. Utah July 28, 2011) (granting motion for judgment on the pleadings because "[a]lthough Plaintiff urges that there are textual and framework differences between the two constitutions, she does not explain, or even attempt to explain, why or how § 1983 fails to fully redress her injuries" and "[f]rom the face of her Amended Complaint it appears that Plaintiff's state constitutional claims are encompassed in her § 1983 claims and can be fully redressed by that remedy"); Blackmore, 2024 WL 2883010, at *25 (granting summary judgment on Utah constitutional claim remedied by Fourth Amendment claim); Nielson v. City of South Salt Lake, No. 2:06-cv-335-CW, 2009 WL 3562081, at *9 (D. Utah Oct. 22, 2009) (dismissing Utah state constitutional claim where that claim provided no further redress than § 1983 claim); Cavanaugh, 2009 WL 4981591, at *6 (dismissing Utah state constitutional claims because plaintiffs' damages could be fully redressed by their § 1983 claim, noting that "[t]he Utah Supreme Court established this requirement to 'ensure that courts use their common law remedial power cautiously and in favor of existing remedies'") (citation omitted)); cf. Sivatia ex rel. Pea v. Fox, No. 2:21-cv-761-DBB-JCB, 2024 WL 3540854, at *10 (D. Utah July 25, 2024) (denying dismissal of Utah state constitutional claims because federal constitutional claims had been dismissed).

Accordingly, the court dismisses the Plaintiffs' parallel state constitutional claims. The court finds it unnecessary to address the Defendants' alternative bases for dismissal.

## CONCLUSION

For these reasons, the Defendants' motion to dismiss (ECF No. 7) is GRANTED IN PART and DENIED IN PART.

1.     The Plaintiffs' first claim for negligence is DISMISSED WITH PREJUDICE against Ms. Dickson, Mr. Woodford, Principal Christensen, Ms. Huber, Ms. Heath, Ms. Caballero, Ms. Bigelow, Mr. Laws, Mr. Girot, Mr. Madsen, and Ms. Hadden.

2.     The Plaintiffs' second claim for vicarious liability is DISMISSED WITH PREJUDICE against the individual Defendants.

3.     The Defendants have not moved to dismiss the Plaintiffs' third claim for premises liability. Accordingly, that cause of action remains.

4.     The Plaintiffs' fourth claim for negligent infliction of emotional distress is DISMISSED WITH PREJUDICE.

5.     The Plaintiffs' fifth claim for loss of filial consortium is DISMISSED WITH PREJUDICE against Ms. Dickson, Mr. Woodford, Principal Christensen, Ms. Huber, Ms. Heath, Ms. Caballero, Ms. Bigelow, Mr. Laws, Mr. Girot, Mr. Madsen, and Ms. Hadden.

6.     The Plaintiffs' sixth, seventh, and eighth claims for violations of the Utah State Constitution are DISMISSED WITH PREJUDICE.

7.     The court denies the Defendants' motion to dismiss the Plaintiffs' ninth claim.

8.     The Plaintiffs' tenth claim for violation of the Fourteenth Amendment Equal Protection Clause is DISMISSED WITH PREJUDICE against Ms. Dickson, Mr. Woodford,

Principal Christensen, Ms. Huber, Ms. Heath, Ms. Caballero, Ms. Bigelow, Mr. Laws, Mr. Girot, Mr. Madsen, and Ms. Hadden.

       9.     The court denies the Defendants' motion to dismiss the Plaintiffs' eleventh claim for municipal liability.

      10.    The Plaintiffs' twelfth claim for violation of substantive due process under the Fourteenth Amendment is DISMISSED WITH PREJUDICE.

      DATED this 27th day of March, 2025.

                BY THE COURT:

                Tena Campbell

                TENA CAMPBELL
                United States District Court Judge